OTTILIE B. KUEHNER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 35511. Promulgated July 31, 1953.

876

*Christopher Del Sesto, Esq.*, for the petitioner.
*James R. McGowan, Esq.*, for the respondent.

OPINION.

TIETJENS, *Judge:* The Commissioner determined a deficiency of $13,808.75 in income tax for 1947. By amended answer the Commissioner has requested an increased deficiency resulting from adding to the petitioner's reported income, long-term capital gain of $29,034.59 rather than $27,500 as set out in the deficiency notice.

In his original determination the Commissioner added rental receipts of $99.75 to the petitioner's income for 1947. This addition is not contested and can be reflected in a Rule 50 computation.

Two questions are presented for decision: (1) Did the petitioner realize taxable income in 1947 from a contract executed August 6, 1947, providing for the sale to Alkay Jewelry Co. of 50 shares of that company's stock? (2) Did the petitioner realize additional taxable income in 1947 from a provision in the same contract whereby Alkay Jewelry Co. released certain claims against the petitioner?

All of the facts have been stipulated and the stipulation is adopted as our findings of fact. The facts necessary to decision are as follows:

The petitioner is a resident of Providence, Rhode Island. Her income tax return for 1947 was filed on the cash basis with the collector of internal revenue of Providence, Rhode Island.

On August 6, 1947, the petitioner and Lena Allin between them owned all the shares of Alkay Jewelry Co. (hereafter sometimes called Alkay) issued and outstanding. The petitioner owned 50 shares which were acquired on October 29, 1946, at a cost of $200 per share.

On August 6, 1947, the petitioner, Alkay, and the Rhode Island Hospital Trust Company (hereinafter sometimes called Trust Company) entered into an agreement wherein the petitioner was referred to as "the Seller," Alkay as "the Buyer," and the Trust Company as "the Trustee." The agreement recited that the seller was desirous of selling her 50 shares of Alkay stock and the buyer was willing to purchase said shares on the terms and conditions set forth therein. Also, that to assure the buyer "that it will receive proper documents

of title evidencing the interest of the Seller in said stock, as and when payments shall have been made as hereinafter set forth, it is contemplated that a Trustee be appointed."

The agreement provided further:

1. The Seller and the Buyer hereby appoint Rhode Island Hospital Trust Company as Trustee for the purposes hereinafter contained.

2. The Seller herewith delivers to the Trustee her fifty (50) shares of the common stock of Alkay Jewelry Co., together with an assignment, hereinafter referred to as "said assignment by the Seller", of all her right, title and interest in the said fifty (50) shares of the common stock of Alkay Jewelry Co., a copy whereof is attached hereto and marked Exhibit "A".

3. The Seller herewith delivers to the Trustee a release of all claims and demands arising under this agreement which she may have against the Buyer, a copy whereof is attached hereto and marked Exhibit "B".

4. The Seller agrees to sell to the Buyer ten (10) shares of the common stock of Alkay Jewelry Co., for the sum of Thirteen Thousand ($13,000) Dollars, payable on February 1, 1948, and agrees to sell to the Buyer ten (10) shares of the common stock of Alkay Jewelry Co., for the sum of Thirteen Thousand ($13,000) Dollars, payable on February 1, 1949, and agrees to sell to the Buyer ten (10) shares of the common stock of Alkay Jewelry Co., for the sum of Thirteen Thousand ($13,000) Dollars, payable on February 1, 1950, and agrees to sell to the Buyer ten (10) Shares of the common stock of Alkay Jewelry Co., for the sum of Thirteen Thousand ($13,000) Dollars, payable on February 1, 1951, and agrees to sell to the Buyer ten (10) shares of the common stock of Alkay Jewelry Co., for the sum of Thirteen Thousand ($13,000) Dollars, payable on February 1, 1952.

5. The Buyer agrees to buy from the Seller ten (10) shares of the common stock of Alkay Jewelry Co., for the sum of Thirteen Thousand ($13,000) Dollars, payable on February 1, 1948, and agrees to buy from the Seller ten (10) shares of the common stock of Alkay Jewelry Co., for the sum of Thirteen Thousand ($13,000) Dollars, payable on February 1, 1949, and agrees to buy from the Seller ten (10) shares of the common stock of Alkay Jewelry Co., for the sum of Thirteen Thousand ($13,000) Dollars, payable on February 1, 1950, and agrees to buy from the. Seller ten (10) shares of the common stock of Alkay Jewelry Co., for the sum of Thirteen Thousand ($13,000) Dollars, payable on February 1, 1951, and agrees to buy from the Seller ten (10) shares of the common stock of Alkay Jewelry Co., for the sum of Thirteen Thousand ($13,000) Dollars, payable on February 1, 1952.

6. The purchase price for each ten (10) shares of the common stock of Alkay Jewelry Co., shall be Thirteen Thousand ($13,000) Dollars and the aggregate purchase price shall be Sixty-Five Thousand ($65,000) Dollars as set forth in Paragraphs (4) and (5) hereof, provided, however, that there shall be deducted therefrom or credited thereon all dividends which may be received by the Trustee on stock of Alkay Jewelry Co., of which it shall be the holder of record. The Buyer shall deliver, on the date of the execution of this agreement, to the Trustee the sum of Sixty-Five Thousand ($65,000) Dollars, which sum shall be held by the Trustee and disbursed in accordance with the provisions of this agreement.

7. The Trustee shall have the following additional rights, powers and duties:

a) On February First of each of the calendar years 1948, 1949, 1950, 1951 and 1952, the Trustee shall:

1) Compute the total payments made to it prior to the close of business on each of such days by the Buyer whether as payments on the purchase price

under Paragraphs (4), (5) and (6) hereof, or whether by way of dividends on the stock of Alkay Jewelry Co., or otherwise, the figure so computed from time to time being hereinafter called the "total payment by the Buyer".

2) Compare the total payment by the Buyer with the amount set forth in Column "B" of the following schedule, hereinafter called "said schedule", in the same numbered line as the date on which the computation is being made:

| | COLUMN "A" | COLUMN "B" |
|---|---|---|
| Line No. 1 | February 1, 1948 | $13,000.00 |
| Line No. 2 | February 1, 1949 | 26,000.00 |
| Line No. 3 | February 1, 1950 | 39,000.00 |
| Line No. 4 | February 1, 1951 | 52,000.00 |
| Line No. 5 | February 1, 1952 | 65,000.00 |

3) If on any of the dates above set forth the total payment by the Buyer shall equal or exceed the amount in Column "B" with which it shall be so compared, the Trustee shall forthwith deliver to the Buyer certificates of stock of Alkay Jewelry Co., representing ten (10) shares of the common stock of Alkay Jewelry Co.

b) The Trustee shall, forthwith upon receipt by it of dividends on any stock of Alkay Jewelry Co., of which it shall be the record owner, pay over the same to the Seller, except that if the payments thereof to the Seller when added to payments theretofore made by the Trustee to the Seller pursuant to the provisions hereinafter set forth would bring the total of all payments by it to the Seller to an amount in excess of Sixty-Five Thousand ($65,000) Dollars, it shall pay to the Seller only such amount of such dividends, if any, as shall be necessary to bring the total amount paid by it to the Seller to the figure of Sixty-Five Thousand ($65,000) Dollars, and all amounts in excess thereof it shall forthwith pay to the Buyer.

c) So long as the total payments by the Trustee to the Seller shall be less than Sixty-Five Thousand ($65,000) Dollars, it shall on February 6th of each of the calendar years 1948, 1949, 1950, 1951 and 1952 pay to the Seller from sums theretofore paid to it by the Buyer such amount, if any, as shall be necessary so that the total payments made by it to the Seller, including all amounts received and paid out by it as dividends on stock of Alkay Jewelry Co., shall be on February 6, 1948, be not less than Thirteen Thousand ($13,000) Dollars, on February 6, 1949, be not less than Twenty-Six Thousand ($26,000) Dollars, on February 6, 1950, be not less than Thirty-Nine Thousand ($39,000) Dollars, on February 6, 1951, be not less than Forty-Two Thousand ($42,000) Dollars, and on February 6, 1952, be not less than Sixty-Five Thousand ($65,000) Dollars.

d) The Trustee shall permit Lena Allin, if she is living, or the executor or administrator of the estate of Lena Allin, if she is not living, to exercise any and all voting rights with respect to any shares of stock of Alkay Jewelry Co., of which it is the record holder hereunder. In exercising the right to vote said stock, Lena Allin or her executor or her administrator shall not be liable to the Seller for any error in judgment.

e) The Sixty-Five Thousand ($65,000) Dollars delivered by the Buyer to the Seller shall be invested by the Trustee by depositing the same in banks or by buying United States Government Bonds. All interest received by the Trustee shall be paid over to the Seller on February 6, 1952.

f) Concurrently with the delivery by the Trustee to the Buyer of certificates of stock of Alkay Jewelry Co., representing the last ten (10) shares of the stock of Alkay Jewelry Co., held by the Trustee, the Trustee shall deliver to the Buyer the release referred to in Paragraph (3) hereof.

8. The Seller shall prior to the date on which the Trustee shall be required to deliver the release to the Buyer in accordance with subparagraph (f) of Clause (7) hereof, pay to the Trustee the sum of Fifty ($50.00) Dollars per year as compensation and the reasonable expenses incurred by it. Such payments shall be made on February 1st of each year beginning February 1st, 1948.

9. The Trustee shall not be under any liability or responsibility whatever for the consequence of any error of judgment or for any mistake of fact or law or for any neglect, action or omission in connection with any matter relating to this agreement or the administration thereof, except for money or other property received by it and not paid out or delivered in accordance herewith or improperly withheld by it hereunder and except for fraud or bad faith. The Trustee shall have a lien upon any and all money and other property in its possession for all amounts due it by way of compensation or reimbursement for expenses.

10. The word "Trustee" as hereinbefore used shall include any successor to Rhode Island Hospital Trust Company as Trustee hereunder. Any such successor shall be appointed on the resignation, refusal to serve or incapacity to act of Rhode Island Hospital Trust Company by the Seller or her executors or administrators and by the President for the time being of the Buyer by an instrument executed by them jointly. If the Seller and the Buyer shall be unable to agree on a successor Trustee within thirty (30) days, either party may apply to any court of competent jurisdiction for the appointment of a successor Trustee.

11. The terms, conditions and covenants of this agreement shall inure to the benefit of and be binding upon the respective parties hereto and their successors and assigns.

IN WITNESS WHEREOF, Ottilie Kuehner has hereunto set her hand and seal, Alkay Jewelry Co., has caused its corporate name to be hereto subscribed and its corporate seal to be hereto affixed by its proper officers, thereunto duly authorized, and Rhode Island Hospital Trust Company has caused its corporate name to be hereto subscribed and its corporate seal to be hereto affixed by its proper officer, thereunto duly authorized, all on the day and year first above written.

Attached to the agreement were the following exhibits:

### EXHIBIT "A"

KNOW ALL MEN BY THESE PRESENTS, THAT I, OTTILIE KUEHNER, of the City of Providence, in the County of Providence and State of Rhode Island, in consideration of good and valuable consideration to me in hand paid, the receipt of which is hereby acknowledged, and for the purpose of carrying out certain agreements on my part to be performed pursuant to the foregoing agreement by and between Ottilie Kuehner, Alkay Jewelry Co., and Rhode Island Hospital Trust Company, do hereby transfer, assign and set over to Rhode Island Hospital Trust Company, a Rhode Island banking corporation, having a principal place of business in said City of Providence, in said County and State, all my right, title, property, interest, claim and demand, in and to:

1. Fifty (50) shares of the common stock of Alkay Jewelry Co., now owned by me and registered in my name on the books of Alkay Jewelry Co.

I do hereby irrevocably constitute and appoint said Rhode Island Hospital Trust Company my attorney to transfer any and all such certificates on the books of said Alkay Jewelry Co., with full power of substitution in the premises.

This assignment to said Rhode Island Hospital Trust Company is in trust for the uses and purposes set forth in a certain agreement of even date herewith

by and between Ottilie Kuehner, Alkay Jewelry Co., and Rhode Island Hospital Trust Company.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this        day of August, A. D. 1947.

In presence of:                          _____

_____

### EXHIBIT "B"

KNOW ALL MEN BY THESE PRESENTS, THAT Ottilie Kuehner, of the City of Providence, in the County of Providence and State of Rhode Island, in consideration of the sum of One ($1.00) Dollar and other valuable considerations to her paid by Alkay Jewelry Co., a Rhode Island corporation located in said City of Providence, in said County and State, the receipt whereof is hereby acknowledged, does hereby remise, release and forever quitclaim unto said Alkay Jewelry Co., its successors and assigns, all and all manner of actions, causes of action, debts, dues, claims and demands, both at law and in equity, which against said Alkay Jewelry Co., its successors or assigns, she ever had, now has or ought to have, for or by reason or means of any matter or thing from the beginning of the world to the date of these presents arising out of or connected with that certain agreement of even date herewith between Ottilie Kuehner, Alkay Jewelry Co., and Rhode Island Hospital Trust Company, for the purchase and the sale of fifty (50) shares of the common stock of Alkay Jewelry Co.

IN WITNESS WHEREOF, the said Ottilie Kuehner has hereunto set her hand and seal this        day of August, 1947.

In the presence of :—                    _____

_____

Also, on August 6, 1947, it was agreed as follows:

### SUPPLEMENT TO AGREEMENT MADE AND ENTERED INTO ON AUGUST 6TH, 1947 BY AND BETWEEN OTTILIE KUEHNER, ALKAY JEWELRY CO. AND RHODE ISLAND TRUST COMPANY.

The parties to the Agreement dated August 6th, 1947 hereby agree that the following shall be added to and become a part of said Agreement with the same force and effect as if the same were included in the original Agreement.

1. Concurrent with the delivery by the Trustee to the Buyer of certificates of stock of Alkay Jewelry Co. representing the last 10 (ten) shares of said stock held by the Trustee, the Trustee shall also deliver to the Seller a release executed by the Buyer, a copy of which is attached hereto and marked "Exhibit C".

2. In the event that the Seller shall die prior to February 6, 1952, the Trustee shall upon request in writing from the Executor named in her will or the Administrator of her estate deliver to said Executor or Administrator the balance of any portion of the selling price of $65,000.00 (Sixty-five Thousand Dollars) which said Trustee shall have in its hands and possession in accordance with the terms of said Agreement at the time of such request. Upon delivery of the balance of said sum as aforesaid, the Trustee shall also deliver to the Buyer such certificates of stock of Alkay Jewelry Co. as it shall then have in its possession and shall also deliver to the Buyer and to the Seller's Executor or Administrator the releases signed by the Seller and the Buyer, respectively.

3. If the Buyer shall file a voluntary petition in bankruptcy or shall be declared bankrupt or insolvent according to law, or if a receiver of its property

shall be appointed, then the Seller may demand from the Trustee the balance of any portion of the selling price of $65,000.00 (Sixty-five Thousand Dollars) which the Trustee shall then have in its hands and possession. Upon delivery of the balance of said sum, the Trustee shall also deliver to the Trustee in bankruptcy for or the receiver of the property of the Buyer such certificates of stock of Alkay Jewelry Co. as it then shall have in its possession and shall also deliver to each party the release signed by the other.

4. This Agreement shall bind and the benefits and advantages thereof shall inure to the respective heirs, executors, administrators, successors and assigns of the parties hereto.

IN WITNESS WHEREOF, Ottilie Kuehner has hereunto set her hand and seal and Alkay Jewelry Co. and Rhode Island Hospital Trust Company have caused their respective corporate names to be hereunto subscribed and their respective seals to be hereunto affixed by the respective officers thereunto duly authorized this 6th day of August, A. D. 1947.

### KNOW ALL MEN BY THESE PRESENTS,

That ALKAY JEWELRY Co., a Rhode Island corporation in consideration of the sum of $1.00 (One Dollar) and other valuable considerations to it paid by OTTILIE KUEHNER, of the City and County of Providence, State of Rhode Island, the receipt whereof is hereby acknowledged does hereby remise, release and forever quitclaim unto said Ottilie Kuehner, her heirs, executors, administrators and assigns all and all manner of actions, causes of action, debts, dues, claims and demands both at law and in equity, which against said Ottilie Kuehner, her heirs, executors, administrators or assigns, said Alkay Jewelry Co. ever had, now has or ought to have for or by reason of any matter or thing from the beginning of the world to the date of these presents arising out of or connected with that said agreement of even date herewith between Ottilie Kuehner, Alkay Jewelry Co. and Rhode Island Hospital Trust Company, for the purchase and the sale of Fifty (50) shares of the common stock of Alkay Jewelry Co.

IN WITNESS WHEREOF said Alkay Jewelry Co. has caused these presents to be signed and its corporate seal to be hereunto affixed by its officer or officers thereunto duly authorized this    day of August, A. D. 1947.

Pursuant to the agreement the petitioner deposited with the Trust Company 50 shares of Alkay stock duly endorsed for transfer. Thereafter the 50 shares were registered on Alkay's books in the name of "Rhode Island Hospital Trust Company, Trustee under agreement dated August 6, 1947." No dividends were paid on the stock during the term of the agreement.

The Trust Company delivered the stock to Alkay in 10-share lots pursuant to the schedule set out in the agreement, that is, periodically upon the annual payments to the petitioner.

On the day after the agreement was executed Alkay delivered $65,000 to the Trust Company which set up an account entitled "Escrow Deposit—Alkay Jewelry Co. et al" and invested such monies as mentioned in the next succeeding paragraph. The amount of $65,000 was paid over by the Trust Company to the petitioner as follows: $12,950 ($13,000 less $50 fee) in February of each year 1948 to 1952, inclusive. The trustee's fee of $50 per year was charged to the petitioner under the terms of the agreement.

On August 25, 1947, the Trust Company purchased $70,000 face value of United States Savings Bonds, Series F, for $51,800. Over the term of the agreement these bonds were redeemed by the Trust Company in connection with the annual payments to the petitioner. On February 7, 1952, the Trust Company delivered to Alkay the release executed by the petitioner pursuant to the agreement of August 6, 1947. On February 13, 1952, the Trust Company paid over to Alkay the interest collected on said bonds in the amount of $1,635.50 less $4.71 expenses, despite the provision of paragraph 7 (e) of the agreement that "All interest received by the Trustee shall be paid over to the Seller on February 6, 1952."

On June 10, 1947, Alkay issued a check for $3,069.18 to pay a personal income tax liability of the petitioner. As of August 6, 1947, Alkay carried this charge to the petitioner's account as an account receivable. Subsequent to August 6, 1947, Alkay tried to collect this account from the petitioner and placed it with an attorney for that purpose. On March 2, 1948, the petitioner compromised the claim and paid Alkay $1,500 in full settlement for any claim Alkay had against the petitioner for monies advanced to the petitioner.

The petitioner reported no gains from sales or exchanges of capital assets on her income tax return for 1947. For each of the years 1948, 1949, 1950, and 1951 she reported the sale of 10 shares of Alkay stock computing $10,950 gain therefrom.

In the notice of deficiency for 1947 the following explanation was made:

It has been determined that your transfer of 50 shares of Alkay Jewelry Co. stock in the year 1947 to the R. I. Hospital Trust Co. under an agreement with the Alkay Jewelry Co., constituted a sale of such stock in the taxable year 1947 and the gain on such sale is taxable to you in that year as a long-term capital gain, subject to the provisions of section 117 of the Internal Revenue Code.

On the first issue the petitioner primarily contends that no completed sale was intended and therefore none made in 1947. The petitioner argues that the agreement of August 6, 1947, was nothing more than an executory contract to make five separate future sales of 10 shares each in the years 1948 to 1952, inclusive, coupled with an escrow agreement to insure performance by both parties, that the stock involved was actually sold and title passed at the times the certificates were delivered to the buyer by the Trust Company, and that in 1947 the petitioner received nothing as income subject to tax in that year. On the second issue the petitioner contends that the item involving the $3,069.18 advance to her by Alkay was in no way connected with the sale of stock or the release under the August 6, 1947, agreement, but was a separate transaction which was compromised by the parties in 1948.

On the other hand, the Commissioner contends that on the facts herein there was, for all practical purposes, a completed transaction in 1947, resulting in the petitioner's receipt in that year of the equivalent of the entire proceeds of the sale. He argues, *inter alia*, that the buyer received immediate beneficial ownership of the shares and the petitioner in exchange received immediate beneficial ownership and also control over the entire amount of the agreed purchase price. He says that the trust accomplished no purpose material to the transaction, was created at the instance of the petitioner, and could have been terminated by her at any time. By affirmative pleading the Commissioner contends that the petitioner received a total consideration of $65,000 plus the amount of $3,069.18 advanced to the petitioner and covered by Alkay's release of all claims against her under the August 6, 1947, agreement.

We think more is here involved than a simple executory contract for the purchase and sale of stock. The arrangement was a 3-party affair, the 3 parties being the petitioner (the Seller), Alkay (the Buyer) and the Trust Company (called the Trustee in the agreement, but simply an escrow agent, by the petitioner in the argument). The Trust Company was trustee for both parties, it held the shares for and on behalf of Alkay and the $65,000 cash consideration for and on behalf of the petitioner. What we are concerned with, however, is not necessarily Alkay's rights in the stock but whether the petitioner divested herself of her stock, by way of exchange, under the agreement in such a manner that she should be taxed on the gain from the transaction in 1947, rather than in the years when Alkay received the certificates.

Our analysis of the agreement convinces us that the petitioner should be taxed in 1947 to the extent of the $65,000 purchase price. By entering into the arrangement in that year the petitioner effectively divested herself of her beneficial interest in the stock. She could no longer vote the stock or receive dividends on it. From that time until delivery to Alkay, the stock was registered in the name of the Trust Company as trustee, but as we see it, for the sole benefit of Alkay. Any dividends were to be applied for the benefit of Alkay and the right to vote was placed in Lena Allin, the owner of the remainder of the Alkay stock. Concurrently with the delivery of the stock to the Trust Company, Alkay delivered to the Trust Company the full $65,000 purchase price with directions, to be sure, to pay that sum according to a specified time schedule to the petitioner. Until actually paid over to her as cash in hand she nevertheless had the full beneficial interest in the fund. It was to be deposited in banks or invested in Government bonds meanwhile, but all interest collected was by the terms of the agreement to be paid to her in 1952. (The

fact that the interest was paid over by the Trust Company to Alkay is unexplained and is contrary to the express terms of the agreement.) The effect of the agreement was that the petitioner in 1947 parted with the beneficial interest in her stock and received in return the beneficial interest in the full purchase price. We find nothing in the arrangement by which the transaction could be undone. There was no remaining condition to be met or performance by either buyer or seller; only the trustee had formal acts of delivery on behalf of both parties.

We think this 3-party arrangement is essentially different from a simple executory buyer-seller contract of sale such as was dealt with in *Estate of W. R. Whitthorne*, 44 B. T. A. 1234, relied on by the petitioner. There, at page 1242, it was said that there was a contract to sell but not an immediate sale and that, in fact, certain shares were delivered and paid for separately in 2 succeeding years. Here, the petitioner had put her stock beyond her control in consideration of payment of the full purchase price to a third party for her benefit. The facts of this case bring it closer to *Scott P. Myers*, 30 B. T. A. 44, where a buyer of stock, for his own protection, deposited part of the purchase price in trust for the seller and where it was held that between the buyer and seller there was a closed transaction and that the seller had received the full selling price despite the fact that the seller had no right to take down the deposited monies until later years.

The petitioner also relies on *Harold W. Johnston*, 14 T. C. 560, where this Court, in discussing whether an executory sales contract was "property (other than money)" and therefore part of the "amount realized," said, in effect, that a simple contract of sale is not in itself property when the contract merely requires future payments and there are not given and accepted as part of the purchase price any notes, mortgages, or other evidences of indebtedness such as commonly change hands in commerce. There, cash was deposited with a bank as escrow agent for both parties but was not constructively received as income to the seller in the year of deposit because certain conditions had to be met and the purchase price was not ascertainable until the subsequent year. As pointed out above, we do not think the arrangement in question in this case is simply an executory sales contract. It is more than that. Here, the full price has been paid for the benefit of the seller. This is more than a mere promise to pay in the future.

The more we study this case the more it appears to us to be governed by the principles applied in *E. T. Sproull*, 16 T. C. 244, affd. 194 F. 2d 541, in regard to the year in which income was received for tax purposes. There, in consideration of past employment, the employer set up a trust fund to be paid over to the taxpayer in years subsequent to the establishment of the trust. We held the taxpayer taxable on

the full amount deposited in the trust in the year the trust was set up. The situation here is analagous although it involves the exchange of a capital asset and hence a capital gain rather than ordinary income. We think it stronger for the Commissioner than the *Sproull* case. The taxpayer could at any time have disposed of the interest she had in the fund in the hands of the Trust Company (the agreement provides that its terms are binding on the parties' "successors and assigns") and no evidence has been introduced to show it was not worth the full $65,000 involved. We conclude she received the equivalent of the full $65,000 in 1947 when the buyer deposited that amount for her benefit with the Trust Company and that she should be taxed on her capital gain in that year. See *Charles F. Kahler*, 18 T. C. 31, where we said at page 34:

Respondent's regulations provide that all items of gross income shall be included in the taxable year in which received by the taxpayer, and that where services are paid for other than by money, the amount to be included as income is the fair market value of the thing taken in payment.

On the second question presented, we agree with the petitioner. The burden on this issue is on the Commissioner and the evidence does not convince us that in 1947 the petitioner received, as part of the purchase price of her stock, the cancellation of the $3,069.18 account receivable which appeared on Alkay's books against the petitioner. From the facts it is apparent that this item was not covered by the agreement of August 6, 1947. It was an item disputed by the parties and settled in 1948 by the payment of $1,500 by the petitioner to Alkay. This transaction was handled by the parties without reference to the agreement here in question.

*Decision will be entered under Rule 50.*