Donald OLIVER and Norma Oliver,
Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. LR-60-C-28.

United States District Court
E. D. Arkansas, W. D.

May 5, 1961.

J. G. Williamson, Little Rock, Ark., for plaintiffs.

Osro Cobb, U. S. Atty., James W. Gallman, Asst. U. S. Atty., Little Rock, Ark., George Hrdlicka, Atty., U. S. Dept. of Justice, Washington, D. C., for defendant.

HENLEY, Chief Judge.

This litigation involves the 1957 income tax liability of the plaintiff, Donald Oliver,[1] a cash basis taxpayer, who

---

1. The plaintiff, Norma Oliver, the wife of Donald Oliver, has been made a party to this action since she and her husband filed a joint return for 1957. However, the income in question is actually that of Mr. Oliver, and no further mention will be made of Mrs. Oliver's presence in the case.

**932**

is a rice farmer residing in Arkansas County, Arkansas. Plaintiff produced a rice crop which he harvested and delivered in October and November, 1957, to Producers Rice Mill, Inc., an agricultural cooperative association organized under the provisions of Act 153 of the 1939 Legislature of the State of Arkansas, Ark.Stats.1947, §§ 77–1001 et seq. In 1958 plaintiff received an advance of $17,959.50 on the rice, and he received the net balance of the ultimate sale price of the crop later in that year. Plaintiff reported no part of the proceeds of his 1957 crop in his federal income tax return for that year, but reported the entire proceeds in his return for 1958. The Commissioner of Internal Revenue determined that the transfer of the rice to the association constituted a sale, and that the advance of $17,959.50 actually received by plaintiff in 1958 had been constructively received in 1957, and assessed a tax deficiency with respect to that year. Plaintiff paid the assessment, and his claim for refund having been denied, this suit followed.

The case was tried to a jury. At the conclusion of plaintiff's case the Government moved for a directed verdict, ruling on which motion was reserved. The Government having elected to put on no proof, the cause was submitted to the jury on two specific interrogatories, hereinafter set forth, and both interrogatories were answered in a manner favorable to the plaintiff. Judgment was not entered at the time since counsel for the Government stated that they desired to file a motion for judgment notwithstanding the jury's answers to the interrogatories. That motion has now been filed, and has been submitted upon the complete record in the case, including a transcript of the evidence, and written briefs.

It is the theory of the plaintiff that the delivery of the rice to the association was not a sale but was simply a delivery of the commodity to plaintiff's agent for the purpose of future sale, and that the association, as agent, received no money from any source in 1957 on account of

70 percent of plaintiff's crop, although 30 percent of said crop was placed in a Commodity Credit Corporation loan in 1957 with the proceeds being received by the association in that year, which proceeds, had they in fact been paid to plaintiff in 1957, could have been treated by him as 1958 income under the provisions of Section 77 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 77. In the alternative, plaintiff contends that even if the transfer of the rice to the association be characterized as a sale, since, prior to the time that plaintiff became entitled to receive any advance on the purchase price he entered into a binding agreement with the association that he was not to receive any advance until January 1958, the advance made to him in that year is not to be considered as having been constructively received in 1957. It is the position of the Government that as a matter of law in the circumstances here present the advance made in 1958 was received constructively in 1957.

■ Since plaintiff was a cash basis taxpayer, he was required to report his gross income in his returns for the years in which such income was actually or constructively received. He was not free to report income actually or constructively received in one year as having been received in some other year or years. 26 U.S.C.A. 1954 Ed., § 451(a); Income Tax Regulations, 1954 Code, § 1.451–1(a) and § 1.61–4; United States v. Pfister, 8 Cir., 205 F.2d 538; Commissioner of Internal Revenue v. Mnookin's Estate, 8 Cir., 184 F.2d 89.

■ Income, although not actually reduced to a taxpayer's possession during a given year, is deemed to be constructively received during that year if during that period it is credited to his account or set apart for him so that he may draw upon it at any time. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. Section 1.451–2(a) of the Regulations.

While a taxpayer, so long as he acts within the law, has the right to minimize his federal income tax obligations or avoid them altogether if he can (Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596), he may not arbitrarily select the year in which a given item of income is to be reported. Where income, although not actually received, is unqualifiedly and without substantial limitation available to the taxpayer in a given year, and his failure actually to receive it is due to nothing other than his own volition, then such income is considered as having been constructively received during that year, and it must be so reported and the tax paid thereon. United States v. Pfister, supra; Acer Realty Co. v. Commissioner of Internal Revenue, 8 Cir., 132 F.2d 512; Helvering v. Gordon, 8 Cir., 87 F.2d 663; Helvering v. Schaupp, 8 Cir., 71 F.2d 736. But, if during the tax year in question the taxpayer has no right to receive income, or if his right to receive it is subject to substantial qualifications or restrictions, then he will not be deemed to have received such income constructively during that year. Commissioner of Internal Revenue v. Tyler, 3 Cir., 72 F.2d 950.

When the item of income in question consists of the proceeds of a sale by the taxpayer of merchandise or other property, including agricultural commodities, and where the sale is completed in a given year and the taxpayer at the time acquires an unconditioned vested right to receive the proceeds of the sale, and the buyer is ready, willing, and able to make payment, the taxpayer cannot avoid treating the proceeds as income for that year by voluntarily declining to accept payment during that year, or by requesting the purchaser not to pay him until a later year, or even by voluntarily putting himself under some legal disability or restriction with respect to payment. In such circumstances, he will be deemed in constructive receipt of the income notwithstanding his refusal to accept payment or his self-imposed restraints on payment. Williams v. United States, 5 Cir., 219 F.2d 523; Hineman v. Brodrick, D.C.Kan., 99 F. Supp. 582.

On the other hand, it must be recognized that a taxpayer has a perfect legal right to stipulate that he is not to be paid until some subsequent year, or that the payments are to be spread out over a number of years. Where such a stipulation is entered into between buyer and seller prior to the time when the seller has acquired an absolute and unconditional right to receive payment, and where the stipulation amounts to a binding contract between the parties so that the buyer has a legal right to refuse payment except in accordance with the terms of the agreement, then the doctrine of constructive receipt does not apply, and the taxpayer is not required to report the income until the same actually is received by him. Glenn v. Penn, 6 Cir., 250 F.2d 507; Kasper v. Banek, 8 Cir., 214 F.2d 125; J. D. Amend, 13 T.C. 178; Wilfred Weathers, 12 T.C.M. 314.

While the doctrine of constructive receipt is recognized and while it is binding upon and available to both the Commissioner and the taxpayer, it is, in a sense, a fiction, and it should not be extended unduly. Mertens Law Of Federal Income Taxation, Rev., § 10.02 and cases there cited.

Characterization of transactions between a cooperative marketing association and one of its members depends ultimately upon the intent of the parties as expressed in the association's articles and by-laws and the contract documents. A delivery of commodities to a cooperative association by one of its members may constitute either a sale or a transaction whereby the association becomes the member's agent to make a sale. In this connection in 35 Am.Jur. Markets and Marketing, § 54, it is said:

"Whether a contract between a co-operative marketing association and its members is a contract of sale or of agency depends, naturally, up-

934

on the provisions of the particular contract. * * *

"The determination of whether a contract is one of absolute sale or a contract of agency depends solely upon the answer to the question as to what the intention of the parties thereto was when construed in connection with the circumstances, conditions, legislation, etc., involved."

Under the internal revenue laws, the proceeds of a loan made to a taxpayer are not includible in the latter's gross income for tax purposes. Mertens, op. cit. § 5.12. Nor would proceeds of a loan become income by virtue of having been borrowed originally by the taxpayer's agent, and then delivered to the taxpayer, either actually or constructively.

In light of the principles stated the trial required resolution of the question whether the plaintiff in 1957 constructively received the $17,959.50 advance actually made to him in 1958, and, assuming that plaintiff did constructively receive the advance, as contended by the Government, then whether the transaction whereby he delivered his rice to the association was a sale of that commodity or merely a transaction whereby the association became plaintiff's agent to sell the rice at some later date.

If the plaintiff did not receive the 1958 advance constructively in 1957, of course it was not in any event taxable income to him in the earlier year. If there was a constructive receipt of the advance in 1957, and if the dealings between plaintiff and the association amounted to a sale of the rice, plaintiff cannot prevail. On the other hand, even if the taxpayer did constructively receive the advance in 1957, still that advance would not be considered as part of his 1957 income if the delivery of the rice to the association was merely an agency transaction. This is true because the undisputed evidence is to the effect that although the association had substantial funds in its treasury when the rice was delivered, nevertheless funds for the making of advances to members of the association were obtained ultimately by the association as loans from either the Commodity Credit Corporation or the St. Louis Bank For Cooperatives. As has been stated, a person is not taxable on money he borrows, and it makes no difference whether he borrows it himself or whether his agent borrows it and then turns it over to him.

The two trial issues were submitted to the jury by means of two interrogatories. The jury was first asked whether, assuming that the delivery of the rice to the association was a sale, it found from a preponderance of the evidence that the advance in question was *not* constructively received in 1957. The jury found that there was no constructive receipt. The second interrogatory inquired whether the jury found from a preponderance of the evidence that the delivery of the rice in 1957 was in fact a transaction whereby the association became plaintiff's agent to sell the rice, rather than a sale of the rice by plaintiff to the association. The jury found that the transaction was one of agency. With respect to both interrogatories the jury was told that the burden was on the plaintiff to establish his position by a preponderance of the evidence.

The question now before the Court in connection with the Government's motion is whether there was sufficient evidence produced by the plaintiff to justify the submission of the respective interrogatories to the jury. In answering that question the Court does not try the case de novo, nor does it weigh the evidence or the credibility of the witnesses. If the evidence was such that reasonable men might differ with respect to the issues, then those issues were for the jury, and its findings will not be disturbed even though the Court might have come to different conclusions had the case been tried to it without a jury. Of course, at this stage of the case the evidence must be viewed in the light most favorable to the plaintiff. 2 Barron &

Holtzoff, Federal Practice & Procedure, § 1079.

The Court is persuaded that the issues in the case were properly submitted to the jury, that the jury's answers to the interrogatories are supported by substantial evidence, and that judgment in favor of plaintiff must be entered.

## I.

In connection with the first interrogatory, which assumed a sale, the jury was instructed as to the constructive receipt doctrine and as to the purpose that it was designed to achieve. The jury was told that if during 1957 plaintiff had an unrestricted right to receive the advance on his rice, and if nothing stood between him and the actual receipt of the advance except his own volition, then he would be deemed in constructive receipt of said advance, and that this would be true even though the amount of the advance might not have been credited formally to plaintiff's account on the books of the association; that, on the other hand, if the amount of the advance was not available to plaintiff in 1957 without substantial restrictions or limitations on his right to receive it, other than a mere self-imposed restriction, then the advance was not constructively received by plaintiff in that year. The Court next instructed as follows:

"Now, Mr. Oliver contends that when he pooled his rice in * * * the association in 1957 he had an agreement with the association that he was not to receive or have any right to receive any advances on his crop prior to 1958.

"You are instructed that the plaintiff and the association had a right to make such an agreement even though the purpose thereof was to make the proceeds of his 1957 crop taxable as income for 1958 rather than for 1957. And if you find from a preponderance of the evidence that when the rice was put in the pool in 1957 the parties actually and in good faith made an arm's length agreement that plaintiff was not to receive or have any right to receive any advance on his 1957 crop until 1958, and that he did not in fact receive any payment on said crop until 1958, then he did not constructively receive any income from said crop in 1957.

"On the other hand, if the alleged agreement was nothing more than a mere direction or request of the plaintiff that he not be advanced or paid anything on his 1957 crop until 1958, and such direction was not intended to be binding upon him, and [if] he could have obtained an advance on his crop in 1957 by making demand therefor, and [if] nothing but his own volition stood between him and the receipt of such advance in 1957, then he would be deemed in the constructive receipt of such advance in 1957, and the amount thereof should have been included in his 1957 return.

"* * * the term 'arm's length transaction' [means] a good faith business transaction between parties, each acting voluntarily for his own self-interest, without giving an unnecessary advantage to the other, in a manner consistent with prevailing business practice."

The evidence relevant to the first interrogatory may be summarized as follows:

Plaintiff testified that for several years prior to 1957 he had marketed his rice through the association, and that in each year the payment to him of the advances to which he was entitled had been deferred by agreement until the following year; that he did not feel that he could afford to pay federal income tax on two rice crops in one year[2]; that he had

2. Plaintiff testified that he paid income tax on his 1954 crop in 1955, on his 1955 crop in 1956, and on his 1956 crop in 1957. Thus, it will be seen that the plaintiff paid income tax based upon proceeds of one crop each year, although such proceeds were reported in the year following that in which the crop was actually grown.

ample storage space on his farm to hold his rice; that he would not have marketed the rice through the association in 1957 unless the association had been willing to agree not to remit the advance until 1958; that the agreement in question was made prior to the time that he was entitled to an advance payment from the association; that he considered the agreement to be mutually binding upon the parties; and that after having made the agreement he would not have felt entitled to compel the association to pay over the advance prior to 1958.

Plaintiff testified further that the agreements that he had each year were oral and informal; that he talked with either Mr. Alderson, the general manager of the association, or a Miss Ward, an employee of the association; that he did not remember with which of those two individuals he talked in 1957, but thought that it was Mr. Alderson; that he did not remember the exact words used by the parties in 1957, but that he would ordinarily go into the association's office and ask if it would be possible to defer payment until the following year, and that the employee with whom he dealt would agree.

Mr. Alderson, the association manager, testified that Mr. Oliver was not the only member of the association who was in the habit of having the payment of his advances deferred for tax purposes. He stated that there were a number of members who followed the same course, and that this method of dealing was highly advantageous to the association since the association could effect substantial savings in interest on money that it would have had to borrow otherwise to make payments of the advances. He testified that he considered that the agreements were binding, and that after they were made the association was not required to pay the advances in the

years in which the rice was delivered and would have had a legal and moral right to refuse to do so. He did admit that if plaintiff had changed his mind about receiving the advance between the time that he delivered the rice in the fall of 1957 and the first of 1958, the association might have considered making payment in the earlier year. He stated that while he had no express authority from the board of directors to enter into agreements for the deferring of payments of advances, such agreements were so obviously to the advantage of the association that he assumed he had the authority; that the directors were familiar with the existence of the agreements and never objected thereto. He testified further that when such agreements were made, including the 1957 agreement with the plaintiff, the association's records of rice received from members concerned would be marked appropriately, and that the individual member's ledger account would not be credited with the advance until payment actually was made.

■ The evidence above abstracted leaves no room for doubt that plaintiff and the association in fact reached an understanding that plaintiff was to be paid no part of his advance on his 1957 crop until 1958, and the Court is not able to say that the record is bare of substantial evidence from which the jury could find, as it did, that this understanding amounted to an enforceable agreement which deprived plaintiff of the right which he had otherwise to receive the advance on the 1957 crop during that year.[3]

As the Court told the jury, the parties had the right to agree that plaintiff was not to receive or have the right to receive payment of the 1957 advance until 1958, and this was true notwithstanding the fact that the motive of plaintiff in making such an agreement might have been to minimize his 1957 tax liability.

3. Under the marketing agreement and the resolution of the board of directors of the association, and aside from the alleged agreement relied upon by plaintiff, he had an absolute right to receive the advance when he delivered the rice. In the ordinary course of business the check in payment of the advance would have been received by plaintiff within a few days after the rice was delivered in October and November, 1957.

There would have been nothing unusual in the parties making such an agreement, and since the deferring of the payment of the advance until 1958 was to the advantage of both parties, they probably could come to their understanding with little or no negotiation and little or no formality. This is particularly true in view of the fact that the 1957 agreement was a continuation of the practice which the parties had adopted in prior years. While the marketing agreement is silent as to deferring payment of advances and contemplated and required that the advances be paid substantially contemporaneously with delivery of the rice, the parties had a right to modify the agreement and to do so orally and informally, provided that they in fact made the agreement in good faith and provided that it was supported by consideration.

Although the Government argues that there was no consideration for the alleged agreement, the Court is convinced to the contrary. Plaintiff testified, and the jury evidently accepted his testimony, that he would not have delivered the rice to the association in the absence of the agreement. The Government points out that plaintiff was obligated by the terms of the marketing agreement to make delivery to the association, and that in making the delivery he did nothing more than what he already was required to do. Assuming that plaintiff was in fact required to make delivery to the association and was not free to dispose of his rice through other channels, the Government's argument overlooks the fact that he was not required to make delivery in 1957. Had plaintiff held the rice on his farm until 1958, as he had a right to do, and had he then delivered the rice and received an advance thereon, the amount of the advance would have been taxable in 1958 and not in 1957.

Plaintiff was aware of the tax consequences of both delivering the rice and receiving the advance in 1957, and he had a right to contract against those consequences. When he delivered the rice on the strength of the association's agreement not to pay him until 1958, he did something that he was not required to do, and in view of the doctrine of constructive receipt plaintiff actually received a benefit taxwise when he yielded his right to receive the advance upon delivery of the rice. The association, on the other hand, was benefitted in that it was not required to make any payment on account of plaintiff's rice until 1958. Hence, there was consideration for the agreement.

It is true that it is possible that after delivering the rice and before the beginning of 1958 plaintiff might have changed his mind and decided that he needed or wanted his money during 1957, and it is also possible that the association might have been willing to pay him in that year. But the question is whether after making the agreement he could have forced the association to make the advance prior to January 1958. The jury had the right to find from the evidence that he could not have done so.

## II.

As to the issue of "sale" versus "contract of agency," which issue was submitted to the jury by means of the second interrogatory, the Court finds it unnecessary to abstract or quote from the association's articles or marketing agreement. Suffice it to say that those documents contain language, stressed by the Government, which is consistent with the idea that plaintiff's delivery of the rice to the association was a sale. On the other hand, said documents contain provisions, emphasized by plaintiff, which are consistent with his theory that when he made delivery of the rice, he merely constituted the association as his agent to make a future sale thereof.

While the existence of those differing provisions may make the nature of the transaction somewhat ambiguous, said provisions are not necessarily inconsistent. Parties creating an agency for the sale of commodities may deem it expedient to place legal title to the subject matter of the agency in the agent, or to invest the agent with certain rights or powers which usually indicate and accompany

ownership of the commodities. In such circumstances, and apart from any questions of the rights of affected third parties who may deal with the agent with respect to the commodities, the relationship between the immediate parties is that of principal and agent, rather than seller and buyer, if the parties actually so intend. That principle has been applied in a number of cases involving cooperative marketing associations. See Texas Certified Cottonseed Breeders Association v. Aldridge, 122 Tex. 464, 61 S.W.2d 79; Bowles v. Inland Empire Dairy Association, D.C.Wash., 53 F.Supp. 210; and Annotations in 33 A.L.R. 253; 47 A.L.R. 946; 77 A.L.R. 412; 98 A.L.R. 1413. See also the discussion of the problem in another context in Farmers' Cooperative Co. v. Birmingham, D.C. Iowa, 86 F.Supp. 201.

Although, as stated, the contract between plaintiff and the association contains provisions which standing alone would indicate that plaintiff's delivery of his rice was a "sale" to the association, the jury had a right to consider the entire contract and the other evidence in the case and to conclude from all the evidence that in delivering his rice plaintiff did not intend to sell it to the association, that the association did not intend to buy it from the plaintiff, and that the true intention of the parties was that the association should take over plaintiff's rice and deal with it as his agent.

In this connection, Mr. Alderson, heretofore mentioned, when asked about what is probably the principal provision of the marketing agreement to which the Government points as indicative that the delivery of the rice amounted to a sale to the association, testified that when the association was formed in 1943, it simply copied the marketing agreement that had been prepared for another cooperative in 1920, which contained the provision in question; that the association has never considered that provision in its operations, and that it did not buy its members' rice; that said provision has been completely ignored; and that, in fact, since this controversy arose the marketing agreement has been rewritten so as to eliminate the provision entirely. He testified that the only rice which the association buys is that belonging to non-members, and that when such purchases are made, the non-members receive full payment immediately. He also testified that the association's "entire operation and entire concept of operating a marketing proceeding cooperative is that you do not buy your members' rice that they tender you for marketing," and that the association gives to its members "the exact amount of money that their rice sells for less our expenses, whether it be more or less." While the jury was not required to accept Mr. Alderson's testimony, it was free to do so.

Counsel for plaintiff may submit a precedent for judgment after first tendering it to opposing counsel for approval as to form.